882 F.2d 605
 55 Ed. Law Rep. 412
 Osceola L. FLETCHER, Gloria B. Corley, Joseph Jeffries-El,
Nilda Munoz, Carmen Maldonado, Felix Vasquez, Maurice Gumbs,
Sam Lambert, Lucy Lucas, Carlos Rondon, Catherine Craig,
Wanda Lopez, Anita Vas Garcia, Elba Roman, Beatrice De
Sapio, Jacques Pessah, Joseph Iorio, Sheldon Plotnick, Jay
Goldman, Rhoda Wattman, Sheldon Fine, Irene Barbaro, James
C. Sullivan, Irving Schwartz, Colleen A. Edmondson, Phillip
Scala and all persons similarly situated, Plaintiffs-Appellees,
v.
Ralph MARINO, both individually and as Temporary President
and Majority Leader of the New York State Senate, the State
Senate of the State of New York, Melvin Miller, both
individually and as Speaker of the Assembly of the State of
New York, the Assembly of the State of New York, Mario
Cuomo, both individually and as Governor of the State of New
York, Stanley Lundine, both individually and as Lieutenant
Governor of the State of New York and as Presiding Officer
and President of the Senate of the State of New York,
Bernard Mecklowitz, Acting Chancellor of the Board of
Education of the City of New York,* Board of
Education of the City of New York, the Board of Elections of
the City of New York, and Robert Abrams as the Attorney
General of the State of New York, Defendants-Appellants.
 Nos. 1381, 1382.
Dockets 89-7457, 89-7459.
 United States Court of Appeals,
Second Circuit.
 Argued June 19, 1989.
Decided June 20, 1989.
Opinion Aug. 9, 1989.
 
 Harvey Golubock, Deputy First Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of State of N.Y., Lawrence S. Kahn, Deputy Sol. Gen., Dennis J. Saffran, Asst. Atty. Gen., New York City, of counsel), for defendants-appellants Marino, The State Senate of the State of N.Y., Miller, The Assembly of the State of N.Y., Cuomo, Lundine and Abrams.
 Linda H. Young, Asst. Corp. Counsel, New York City (Peter L. Zimroth, Corp. Counsel of City of New York, Leonard Koerner, Ellen B. Fishman, Asst. Corp. Counsel, New York City, of counsel), for defendants-appellants Mecklowitz, Bd. of Educ. of City of New York, and Bd. of Elections of City of New York.
 Robert Allan Muir, Jr., Brooklyn, N.Y., for plaintiffs-appellees.
 Jay Worona, Deputy Counsel and Director of Litigation Services, Cynthia P. Fletcher, N.Y.S. School Boards Ass'n, Albany, N.Y., Robert E. Diaz, Counsel and Deputy Com'r for Legal Affairs, Mary Ellen Lorini, State Educ. Dept., Albany, N.Y., Rhonda Weingarten, Counsel to the President, United Federation of Teachers, New York City, for amici curiae, N.Y.S. School Boards Ass'n, State Educ. Dept. and United Federation of Teachers.
 Before MESKILL, PIERCE and MAHONEY, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 These are expedited appeals from an amended judgment entered pursuant to Fed.R.Civ.P. 54(b) in the United States District Court for the Eastern District of New York, Costantino, J., that granted plaintiffs-appellees' request for a declaration that portions of the New York State law governing elections for New York City community school boards are unconstitutional. Because newly elected school board members were to be sworn in on July 1, 1989, we issued a summary order on June 20, 1989, noting that a full opinion would follow. We now set forth the reasons for our decision of June 20, 1989 reversing the judgment of the district court.
 
 BACKGROUND
 
 2
 In 1969, New York State established a decentralized system to operate New York City schools below the high school level. See N.Y.Educ.Law Secs. 2590 to 2590-n (McKinney 1981 & Supp.1989), as amended by Act of Dec. 19, 1988, ch. 739, 1988 N.Y.Laws 1551 (McKinney 1989) (the Serrano Law). Under this framework, New York City public schools are governed by two distinct bodies: community school boards and the New York City Board of Education.
 
 
 3
 Currently, there are thirty-two community school boards in New York City. Under the decentralized system, these community school boards run New York City schools from the pre-kindergarten and nursery school levels through the junior high school level. Id. Sec. 2590-e. The community boards have the power, inter alia, to hire teachers, principals and other school employees, to determine which textbooks students will use, to operate school buildings and to provide for and operate school cafeterias and meal services. Id. The Board of Education has the same powers over the City's high schools, in addition to such broader powers as approval of systemwide curricula and determination of city-wide policy for all schools. Id. Sec. 2590-g. Before its amendment by the Serrano Law, section 2590-c.4 provided that community school board members could not be employed by the district for which they served as a board member.
 
 
 4
 In 1987, a Bronx grand jury inquiring into the influence of politics in the decentralized system released a report entitled "Politics in Our School System: A Corrupting Influence." The grand jury found that improper political influences existed in the system and that persons with positions on community school boards often used their positions to help their friends and political allies. Similarly, some community board members used their positions to procure the political services of school system employees.
 
 
 5
 This political favoritism extended beyond simple intradistrict exchanges. Community school board members would on occasion aid friends who were employees of other districts, who could in turn aid the community board member's own career. The grand jury report cites the case of one community school board member who was a member of a voting bloc on his community board. This member chose a "former teaching associate" as a candidate for an assistant principal's job in the member's district. Because of the voting bloc, this candidate was assured of receiving the position. Two years after the candidate was selected for the assistant principal's job, the community board member who selected him received "a high level position as an assistant to the superintendent in the district where the assistant principal was now a new Board member."
 
 
 6
 In addition, the grand jury found that teachers and other community school board employees had at times been asked to participate in political activities while they were in school. Abuses were so common that "candidates recommended by political leaders received virtually automatic support from certain [community] School Board members." The grand jury recommended, inter alia, that "no Board of Education employee should serve on a Community School Board" and that "no elected official should serve on a Community School Board." Apparently in response to the grand jury report and other allegations of misconduct, New York adopted the Serrano Law on December 19, 1988.
 
 
 7
 The Serrano Law made several changes in the laws governing the New York City school system. The provision at issue in these appeals altered section 2590-c.4 to read, in pertinent part:
 
 
 8
 A member of a community board shall be ineligible to be employed by the community board of which he is a board member, any other community board or the city board. No person shall be eligible for membership on a community board if he holds any elective public office or any elective or appointed party position except that of delegate or alternate delegate to a national, state, judicial or other party convention, or member of a county committee.
 
 
 9
 Act of Dec. 19, 1988, ch. 739, Sec. 3, 1988 N.Y.Laws at 1552. A new subdivision states that community school board elections are to be governed by New York election law "so far as applicable." Id. Sec. 5, 1988 N.Y.Laws at 1553. While the education law does not define the term "party position," as used in section 2590-c.4, the election law on the other hand defines it as "membership on a party committee or the position of delegate or alternate to a party convention." N.Y.Elec.Law Sec. 1-104.4 (McKinney 1978). "Party" is defined as "any political organization which at the last preceding election for governor polled at least fifty thousand votes for its candidate for governor." Id. Sec. 1-104.3.
 
 
 10
 Plaintiffs-appellees are members of community school boards, employees of community school boards and the Board of Education, party committee members, voters in New York City and parents.[1] The complaint alleges that one plaintiff, Jay Goldman, "has elected not to seek reelection to the [community school] Board of which he was President because of Sarano [sic] legislation."
 
 
 11
 Plaintiffs alleged five causes of action, only two of which are at issue in these appeals.[2] These two claims (plaintiffs' fourth and fifth causes of action) are that the Serrano Law's restriction on persons eligible to serve on community school boards violates plaintiffs' "first and fourteenth amend[ ]ment rights by potentially limiting their ability to seek [the] public office of Member of [a] Community School Board," and that this same provision violates the First and Fourteenth Amendments and 42 U.S.C. Sec. 1973 (1982) by denying plaintiffs their rights "to select a candidate of their choice as [a] member of [a] community school board."
 
 
 12
 The district court consolidated plaintiffs' request for a preliminary injunction on these two counts with the trial on the merits, see Fed.R.Civ.P. 65(a)(2), and granted plaintiffs' request for a declaration that the Serrano Law was unconstitutional. It denied plaintiffs' request for a preliminary injunction, however. In an opinion filed on April 26, 1989, the district court reasoned that the Serrano Law has a "chilling effect" on persons who otherwise might run for a community school board position, even though the law did not by its terms prevent anyone from running for office. The court concluded that the statute was "not carefully tailored so as to be the least restrictive to plaintiffs' rights" and therefore was an unconstitutional restraint on plaintiffs' First and Fourteenth Amendment rights.
 
 
 13
 On May 2, 1989, community school board elections were held. At least thirteen of the plaintiffs were elected to positions on community boards in that election.[3] An amended judgment was entered pursuant to Fed.R.Civ.P. 54(b) on May 4, 1989. Defendants filed notices of appeal on May 5, 1989. We heard argument on June 19, 1989, and on June 20, 1989 entered an order reversing the decision of the district court. On July 1, 1989, persons who were elected to community school boards in the May 2 elections took office.
 
 DISCUSSION
 A. Entry of Judgment Pursuant to Rule 54(b)
 
 14
 The Federal Rules of Civil Procedure require that
 
 
 15
 [w]hen more than one claim for relief is presented in an action, ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims ... only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims ... shall not terminate the action as to any of the claims ... and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
 
 
 16
 Fed.R.Civ.P. 54(b). The district court's amended judgment states that "there is no just reason for delay" of an appeal of its decision granting judgment to plaintiffs on their fourth and fifth causes of action. The court was required to make this finding by Rule 54(b); however, our precedent requires that the court do more than merely reiterate the words of the Rule. Instead, the reasons alluded to by the court must be spelled out. Conclusory repetition of the Rule's language will not suffice. National Bank v. Dolgov, 853 F.2d 57, 58 (2d Cir.1988) (per curiam). While the district court did, in an order, state that "the issues ruled on present an issue of significant public concern," its language was little more than repetition of the Rule's phraseology.
 
 
 17
 Where the reasons for the entry of judgment are obvious, however, and a remand to the district court would result only in unnecessary delay in the appeal process, a district court's entry of judgment pursuant to Rule 54(b) will satisfy the purposes of the Rule even though the court did not state the reasons for its determination that judgment should be entered. See Pension Benefit Guaranty Corp. v. LTV Corp., 875 F.2d 1008, 1014 (2d Cir.1989) (citing Gumer v. Shearson, Hammill & Co., 516 F.2d 283, 286 (2d Cir.1974)); see also National Bank, 853 F.2d at 58 (district court did not give reasons for certification under Rule 54(b) and reasons for certification were not apparent from limited record before the Court); Perez v. Ortiz, 849 F.2d 793, 796-97 (2d Cir.1988) (policies underlying Rule 54(b) best served by exercising jurisdiction over appeal where reasons district court would provide on remand were "obvious"). We believe that the reasons for the district court's action are obvious. The two severed causes of action are independent from those left undecided, they have been finally determined, an immediate appeal will expedite resolution of the issues in this case, an early resolution of the issues will facilitate the state's effort to eradicate corruption in New York City school governance and no purpose would be served by delaying an appeal of the issues until a final determination of plaintiffs' remaining claims. We therefore hold that we have jurisdiction over this appeal.
 
 B. Standing
 
 18
 Under the constitutional doctrine of standing, a plaintiff must allege that he or she is suffering from an injury directly traceable to the actions of the defendant(s). See Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-1926, 48 L.Ed.2d 450 (1976). In this case, plaintiffs' amended complaint only alleges injury to plaintiff Goldman caused by the Serrano Law. However, the complaint also alleges that the law "potentially limit[§ plaintiffs'] ability to seek [the] public office of Member of [a] Community School Board," and that the law infringes on plaintiffs' rights "as voters to select a candidate of their choice." Furthermore, a letter and documents supplied to us at our request following oral argument reveal that at least thirteen of the plaintiffs were elected to community school boards in the May 2, 1989 elections. The defendants advise us that each of these thirteen plaintiffs has been determined to be ineligible for membership on a community school board under the Serrano Law. The thirteen include community school board employees, Board of Education employees and political party office holders. Therefore, despite the almost total lack of specific allegations of injury resulting from the Serrano Law, we find that, at least as to these plaintiffs and as to Goldman, there "is a sufficient threat of actual injury to satisfy Art. III's requirement that '[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.' " Pennell v. City of San Jose, 485 U.S. 1, ----, 108 S.Ct. 849, 854, 99 L.Ed.2d 1, 10 (1988) (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979)).
 
 C. The Merits
 
 19
 Plaintiffs' fourth and fifth causes of action cite both the First and the Fourteenth Amendments to the Constitution as their legal bases. It is apparent from the arguments made both to us and to the district court, however, that plaintiffs' invocation of the Fourteenth Amendment is intended not as an assertion of a violation of plaintiffs' rights to equal protection of the laws but as a recitation of the Fourteenth Amendment's application of the strictures of the First Amendment to the states. See, e.g., Eu v. San Francisco County Democratic Central Comm., --- U.S. ----, ----, 109 S.Ct. 1013, 1017, 103 L.Ed.2d 271, 278 (1989); Meyer v. Grant, 486 U.S. 414, ----, 108 S.Ct. 1886, 1889, 100 L.Ed.2d 425, 432 (1988). Additionally, plaintiffs contend that the Serrano Law violates 42 U.S.C. Sec. 1973 (denial or abridgement of voting rights), an argument that the district court did not reach.
 
 
 20
 The district court's decision was based in large part on the court's understanding of the protection given by the First Amendment to plaintiffs' freedom of association. This freedom certainly
 
 
 21
 means not only that an individual voter has the right to associate with the political party of her choice, but also that a political party has a right to " 'identify the people who constitute the association,' " and to select a "standard bearer who best represents the party's ideologies and preferences."
 
 
 22
 Eu, --- U.S. at ----, 109 S.Ct. at 1019 (quoting Tashjian v. Republican Party, 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986) (in turn quoting Democratic Party of the United States v. Wisconsin ex rel. La Follette, 450 U.S. 107, 122, 101 S.Ct. 1010, 1019, 67 L.Ed.2d 82 (1981)) and Ripon Soc'y, Inc. v. National Republican Party, 525 F.2d 567, 601 (D.C.Cir.1975) (in banc) (Tamm, J., concurring), cert. denied, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976))) (citations omitted). "Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders." Id. at ----, 109 S.Ct. at 1023. The Serrano Law does not impermissibly burden any of these rights of plaintiffs.
 
 
 23
 Where such fundamental rights are implicated, i.e., "[i]f the challenged law burdens the rights of political parties and their members," id. at ----, 109 S.Ct. at 1019, a challenge under the First Amendment is reviewed under a strict scrutiny standard. Only if the state can demonstrate that it has a compelling interest in the challenged provision and that the provision is narrowly tailored to effectuate that interest will the provision survive such scrutiny. Id. In this case, however, we are not presented with circumstances similar to those that have justified strict scrutiny. Rather, we have before us a situation to which a lesser standard of review applies.
 
 
 24
 Those cases that have used heightened scrutiny to analyze a statute under the First Amendment have typically involved restrictions on voters' access to the polls, candidates' access to the ballot and the internal workings of political parties. For example, in Eu, plaintiffs challenged provisions of the California Elections Code that prevented governing bodies of political parties from endorsing candidates in primary elections, imposed conditions on the parties' organization and set requirements for the position of party chairperson. Id. at ----, 109 S.Ct. at 1016. The Supreme Court held that these provisions burdened the First Amendment associational rights of both political parties and party members, and that California had not advanced a compelling interest sufficient to justify them. Id. at ----, 109 S.Ct. at 1015.
 
 
 25
 In making its decision, however, the Court distinguished between permissible "infringement on the associational rights of the parties and their members [that] was the indirect consequence of laws necessary to the successful completion of a party's external responsibilities in ensuring the order and fairness of elections," id. at ----, 109 S.Ct. at 1023-26, and direct regulation of parties and party members designed to ensure intraparty peace and eliminate voter confusion. Id. at ----, 109 S.Ct. at 1021.
 
 
 26
 Similarly, in Tashjian, a Connecticut statute prohibiting voters who were unaffiliated with a political party from voting in that party's primary was challenged by Republicans who wanted to allow unaffiliated voters to vote in their primary. The Court struck down the law, contrasting that statute with acceptable regulation "undertaken to prevent the disruption of ... political parties from without, and not ... to prevent the parties from taking internal steps affecting their own process for the selection of candidates." 479 U.S. at 224, 107 S.Ct. at 553.
 
 
 27
 Eu and Tashjian concerned state regulation of political parties that affected how the parties operated and how the parties' candidates were chosen by the people. The Court has also found statutes that have an inhibiting effect on independent candidates to be constitutionally infirm where the state can put forth no compelling reason for their enactment. For example, in Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court reversed a Court of Appeals decision that had sustained an Ohio law limiting candidate access to the ballot. The statute required that persons desiring to run for president declare their candidacy seven and a half months before the presidential election. Id. at 782-83 & n. 1, 103 S.Ct. at 1566-67 & n. 1. The Court suggested that the state's asserted interests were not served by the statute, id. at 806, 103 S.Ct. at 1579, and that Ohio's asserted justifications were not sufficiently compelling to validate the law, id. at 786 n. 7, 103 S.Ct. at 1569 n. 7 (Court relied on cases "applying 'fundamental rights' strand of equal protection analysis"), id. at 806, 103 S.Ct. at 1579 (state cannot unnecessarily restrict fundamental rights). In Anderson the Court distinguished the situation at hand from cases where a state has imposed restrictions on candidacy "that serve legitimate state goals which are unrelated to First Amendment values." Id. at 788 n. 9, 103 S.Ct. at 1570 n. 9 (citing Clements v. Fashing, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982)). We believe that the Serrano Law is just such a legitimate restriction and that it is properly analyzed under a rational basis standard.
 
 
 28
 In contrast to laws such as those at issue in Eu, Tashjian and Anderson, laws that implicate, in a limited fashion, a person's rights to participate in politics and to serve as an elected official have survived review under the First Amendment and have not been subjected to strict scrutiny. See, e.g., Unity Party v. Wallace, 707 F.2d 59, 62-64 (2d Cir.1983) (statute that did not "significantly encroach upon the rights to vote and to associate for political purposes" was "subject only to a rational basis analysis"); see also L. Tribe, American Constitutional Law, Sec. 13-18, at 1097 & n. 1, Sec. 13-19, at 1098 (2d ed. 1988). These laws differ from those that have been declared unconstitutional under strict scrutiny in that they do not control political parties or the party process, but ensure fairness in both elections and in government service. The companion cases of United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), illustrate this point. Letter Carriers was a challenge to section 9(a) of the Hatch Act, 5 U.S.C. Sec. 7324(a)(2) (1982), which prohibits executive branch federal employees and District of Columbia officials from using their "official authority or influence" to affect election results and from being actively involved in "political management or ... political campaigns." Letter Carriers, 413 U.S. at 550, 93 S.Ct. at 2883. The Court "unhesitatingly" upheld the law, reaffirming United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), in the process. Letter Carriers, 413 U.S. at 556, 93 S.Ct. at 2886. In fact, the Court explicitly stated that a law that
 
 
 29
 forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention
 
 
 30
 would be "unquestionably ... valid." Id. Furthermore, the Court observed that the rights to associate and participate in politics are not absolute and that federal employees' political activities could be constitutionally prohibited. Id. at 567, 93 S.Ct. at 2891.
 
 
 31
 In Broadrick, the challenged provision was a state statute that restricted civil servants' political activities in a manner similar to the Hatch Act. 413 U.S. at 602, 93 S.Ct. at 2911. The challenge in Broadrick was based on the contention that the statute's prohibitions were vague and overbroad. The Court disagreed, and held that
 
 
 32
 at least insofar as it forbids classified employees from: soliciting contributions for political candidates, political parties, or other partisan political purposes; becoming members of national, state, or local committees of political parties, or officers or committee members in partisan political clubs, or candidates for any paid public office; taking part in the management or affairs of any political party's partisan political campaign; serving as delegates or alternates to caucuses or conventions of political parties; addressing or taking an active part in partisan political rallies or meetings; soliciting votes or assisting voters at the polls or helping in a partisan effort to get voters to the polls; participating in the distribution of partisan campaign literature; initiating or circulating partisan nominating petitions; or riding in caravans for any political party or partisan political candidate
 
 
 33
 the Oklahoma statute was valid. Id. at 616-17, 93 S.Ct. at 2918.
 
 
 34
 The doctrine of Letter Carriers and Broadrick was later followed in Clements v. Fashing, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). In Clements, plaintiffs challenged two sections of the Texas Constitution. The first section prohibited certain officials from holding a seat in the Texas Legislature prior to the expiration of their terms of office. Id. at 960, 102 S.Ct. at 2842. The second provision was known as a "resign-to-run" provision, and required that before an official could run for any elective office other than the one the official currently held, he or she had to resign the current office. Id.
 
 
 35
 Plaintiffs were officials subject to the provisions, and they challenged the constitutional provisions on two grounds: the Equal Protection Clause and the First Amendment. The majority had no trouble upholding the challenged sections under both theories, holding that under Equal Protection analysis, the provisions should not be judged by the light of strict scrutiny, id. at 965-66, 972-73, 102 S.Ct. at 2844-45, 2848-49, and that the determination that the provisions did not violate the Equal Protection Clause "dispose[d]" of the First Amendment argument, id. at 971, 102 S.Ct. at 2847. Because the Texas Constitution's "burden on [plaintiffs'] First Amendment interests in candidacy [is] so insignificant[,] ... [t]he State's interests in this regard are sufficient to warrant the de minimis interference with [plaintiffs'] interests in candidacy." Id. at 971-72, 102 S.Ct. at 2848.
 
 
 36
 The Serrano Law is less burdensome than the type of restrictions that the Supreme Court has already approved as valid restrictions on government employees' political activities. The provision of the Serrano Law at issue here does no more than prohibit certain municipal employees, political party office holders and elected officials from being community school board members. It does not stop anyone from running for any office. Nor does it prohibit the broad range of political activities by community school board members that were at issue in Letter Carriers and Broadrick. As to community school board and Board of Education employees and as to political party officers, the Serrano Law is constitutional. Plaintiffs do not challenge the law as it applies to elected officials.
 
 
 37
 Letter Carriers and Broadrick explicitly approved restrictions on federal and state employees' political activities. While those restrictions were directed primarily at the employees, and the Serrano Law is directed at community school board members, we do not believe that this distinction is one of consequence. The Serrano Law was apparently passed in reaction to a Bronx grand jury conclusion that where politics and government employment collide, misconduct and loss of voter confidence can result and that such misconduct and loss of voter confidence had in fact resulted in the case of the community school boards. To limit the intersection of school boards, politics and employment is no less a rational way of dealing with the identified problem than were the laws in Letter Carriers and Broadrick valid ways of dealing with the problem of politics in government employment. Broadrick explicitly endorsed outright prohibitions on government employees running for all elective offices. The Serrano Law goes no further, and indeed stops far short of such a law. The burden on plaintiff employees here is no greater than those burdens previously found to be constitutional, and the connection to a valid state interest is no less distinct. We therefore hold that this portion of the Serrano Law is constitutional under the First Amendment.
 
 
 38
 Nor is the restriction on certain political party officers becoming community school board members violative of the Constitution. The Serrano Law applies to membership on a party committee other than at the county level. See N.Y.Educ.Law Sec. 2590-c.4; N.Y.Elec.Law Sec. 1-104.4. It does not apply to members of county committees or political clubs or to convention delegates. It also is much less restrictive than the laws upheld in Broadrick and Letter Carriers. The burden on those party officers who cannot serve as community school board members is certainly no greater than the burden on those party officers affected by the Hatch Act who could not be employed by the executive branch of the federal government and those state employees who could not be party officers in Oklahoma.
 
 
 39
 As it applies to both employees and party officers, the Serrano Law does not even require that a person resign a position to run for office, as did the valid constitutional provision in Clements. It merely states that if a person affected by the law runs for a position on a community school board and is elected, that person must choose between the community school board and the employment or party position described in the Serrano Law. This is unquestionably a valid exercise of the state's power and not a violation of the First Amendment. Plaintiffs attempt to argue that because they have been allowed to run for office they cannot now be prevented from taking office. This argument is absurd. That plaintiffs have been allowed to run, even though they are now forced to choose between their other activities and their community school board positions, does not create a right for them to hold office. The Serrano Law is less restrictive than resign-to-run provisions, such as the one at issue in Clements. New York certainly could have enacted a resign-to-run statute instead of the less restrictive resign-to-serve Serrano Law. The enactment of the less restrictive resign-to-serve statute can hardly be said, however, to have accorded plaintiffs an expectation that if they won an election they could serve without resigning from activities prohibited by the Serrano Law.
 
 
 40
 Plaintiffs also argue that the Serrano Law impermissibly affects their rights to choose political leaders and their rights as voters to choose candidates. While political parties and their members do have a right to determine the mechanism for selecting their leaders without undue interference from the state, see Eu, --- U.S. at ----, 109 S.Ct. at 1023, that right is not absolute. The state's determination in this instance that certain party officials should not also be allowed to hold a position on a community school board is not undue interference of the type struck down in Eu. The New York State Legislature has neither told the parties how their leaders will be selected nor hampered the leaders' role within the party. All that it has done is to limit such leaders' outside activities in one small aspect and it has done this in furtherance of the rational and legitimate goal of deterring improper political influence in the New York City school system.
 
 
 41
 Nor has the legislature impermissibly limited the voters' rights to choose a candidate. It has not prevented people with certain ideas from becoming candidates. It has not prevented people from certain protected backgrounds from becoming candidates. It has only prevented people holding certain jobs or certain party leadership positions from becoming members of community school boards. We recognize that although the Serrano Law is phrased in terms of the eligibility of a candidate to serve as a community school board member, " 'the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.' " Anderson, 460 U.S. at 786, 103 S.Ct. at 1568 (quoting Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972)). The Serrano Law violates neither the rights of candidates nor the rights of voters. The effects of the Serrano Law of which plaintiffs complain are no more than "the indirect consequence of laws necessary" to the state's responsibility to ensure that the New York City school system is governed in a fair and honest manner. See Eu, --- U.S. at ----, 109 S.Ct. at 1023-24. As such, they are not improper burdens on plaintiffs' First Amendment rights.
 
 
 42
 Finally, plaintiffs, in the fifth cause of action of their complaint, claimed that the Serrano Law violates 42 U.S.C. Sec. 1973. The district court did not reach this question, having invalidated the law under the Constitution, and plaintiffs-appellees have not raised it on appeal. Section 1973 prohibits voting qualifications that "result[ ] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. Sec. 1973(a). When the district court consolidated the motion for a preliminary injunction with the trial on the merits of the two counts underlying the appeals here, it distinguished those issues it was consolidating from those it was not by referring to the consolidated issues as the "constitutional" ones and the other issues as the "district[ing] question." This distinction does not clearly include the section 1973 question in those issues to be decided by the district court in the consolidated trial. Nevertheless, plaintiffs did not object to the consolidation and did not request that additional evidence be submitted on the issues to be decided by the court in the consolidated action. Nor did they ask for a clarification as to whether the district court would be considering their section 1973 allegation. On the other hand, the court's amended judgment clearly stated that it had severed "plaintiffs' fourth and fifth causes of action from the remaining claims of plaintiffs' complaint."
 
 
 43
 From the evidence submitted to the district court and the arguments made by the plaintiffs, we see no basis for a section 1973 claim based on the candidate qualification provision of the Serrano Law. Plaintiffs have certainly not attempted to argue to this Court that the qualification provision has a disparate impact on protected classes of voters and therefore infringes on their rights as protected by section 1973. Although they alluded to alleged disparities in impact on protected classes of candidates in the district court, they asserted no connection between such an effect on candidates' rights to run and citizens' rights to vote. Plaintiffs failed to produce sufficient evidence in the district court to support a claim that the Serrano Law's qualification provision violates their rights to vote as protected by section 1973. Because plaintiffs' proof at trial was insufficient as a matter of law, it is not necessary to remand to the district court to decide this issue.
 
 CONCLUSION
 
 44
 For the foregoing reasons, we have reversed the judgment of the district court. The Serrano Law's community school board qualification provision does not violate the First Amendment rights of plaintiffs and plaintiffs did not adduce sufficient evidence in the district court to support the allegation in their fifth cause of action of a violation of 42 U.S.C. Sec. 1973. Plaintiffs' fourth and fifth causes of action are hereby dismissed.
 
 
 
 *
 Originally, former Chancellor Richard Green was a party to this action. Chancellor Green died on May 10, 1989, and Acting Chancellor Mecklowitz is being substituted as a party pursuant to Fed.R.App.P. 43(c)(1). See Lehman v. Burnley, 866 F.2d 33, 33 n. * (2d Cir.1989); Board of Educ. v. Harris, 622 F.2d 599, 602 n. 1 (2d Cir.1979), cert. denied, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981)
 
 
 [1]
 Although the caption of plaintiffs' amended complaint refers to "all persons similarly situated," there has been no request for certification of a class under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 23
 
 
 [2]
 Plaintiffs' first three causes of action concern districting provisions of the education law, and include allegations that the current community school board districts violate the one person one vote principle embodied in the Fourteenth and Fifteenth Amendments to the Constitution and 42 U.S.C. Sec. 1973 (1982)
 
 
 [3]
 The thirteen are: Joseph Iorio (a teacher), Sheldon Fine (an assistant principal), Carmen Maldonado (a teacher), Nilda Munoz (a Board of Education employee and a Republican District Leader), Maurice Gumbs (a teacher), Gloria B. Corley (a Board of Education employee), Colleen A. Edmondson (a community school board employee), Jacques Pessah (a Board of Education employee), Irene Barbaro (a state political party committee member), Sheldon Plotnick (a Democratic state committee member), Irving Schwartz (a teacher), Joseph Jeffries-El (a state political party committee member) and Felix Vasquez (a principal)